1
2
3
4                     UNITED STATES DISTRICT COURT
5                          DISTRICT OF NEVADA
6                                  * * *
7    ALICIA C. TURNER,                      Case No. 2:16-cv-02932-APG-GWF
8                        Plaintiff,         **REPORT AND RECOMMENDATION**
            v.
9                                           **Re: Motion for Reversal and/or**
     NANCY A. BERRYHILL, Acting             **Remand (ECF No. 17)**
10   Commissioner of Social Security,
11
                         Defendant.
12
13

14          This case involves judicial review of administrative action by the Commissioner of Social

15   Security denying Plaintiff's claim for disability benefits under Titles II and XVI of the Social

16   Security Act.  Plaintiff's Complaint (ECF No. 5) was filed on April 13, 2017.  Defendant's

17   Answer (ECF No. 11) was filed on June 20, 2017.  Plaintiff's Motion for Reversal or Remand

18   (ECF No. 17) was filed on August 18, 2017, and the Commissioner's Cross-Motion to Affirm

19   and Opposition to Plaintiff's Motion to Remand (ECF No. 20) was filed on October 12, 2017.

20                                   **BACKGROUND**

21          **A. Procedural History**

22          Plaintiff filed applications for a period of disability, disability insurance benefits, and

23   supplemental security income on April 9, 2013, alleging that she became disabled on April 14,

24   2010.   Administrative Record ("AR") 168-180.  The Commissioner denied Plaintiff's claim on

25   July 9, 2013.  AR 61-69, 70-78.  Plaintiff filed a request for reconsideration which was denied on

26   November 12, 2013.  AR 83-92; 93-102.  She requested a hearing before an Administrative Law

27   Judge ("ALJ") which was conducted on March 12, 2015.  AR 124-125; 31-60.   The ALJ issued

28   his decision on January 10, 2014, finding that Plaintiff was not disabled and denying her claim

1   for disability benefits.  AR 11-30.  The Appeals Council denied Plaintiff's request for review on

2   October 20, 2016.  AR 1-7.  Plaintiff then commenced this action for judicial review pursuant to

3   42 U.S.C. § 405(g).  This matter has been referred to the undersigned magistrate judge for a

4   report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

5           **B. Factual Background**

6           Alicia C. Turner was born on August 29, 1983.  She completed high school and attended

7   technical school to become a medical assistant. At the time of the hearing, she resided in an

8   apartment with her husband and their four children (ages 9, 8, 4, and 2).  Plaintiff's mother also

9   resided with the family.  AR 35-36.  Plaintiff is 5'4" tall and weighed 185 pounds at the time of

10  her application.  AR 195.

11          **1.  Plaintiff's Disability/Work History Reports and Hearing Testimony.**

12          Plaintiff stated in her disability application that she was unable to work due to lupus.  AR

13  168.  She stated in her May 10, 2013 work history report that she previously worked as a

14  customer service representative for a student loan company, a recovery agent for collection

15  companies, a customer service representative for payday loan companies; briefly as a medical

16  assistant, a sales associate for an office supply company, a clerk for an automobile dealership,

17  and a retail sales associate.  AR 202-224.  She stated that she could no longer work because she

18  was unable sit or stand for long periods.  She also had difficulty using her hands to write or type.

19  AR 224.  In an August 14, 2013 disability report, Plaintiff stated that her condition had gotten a

20  "little worse" since her prior report.  She was unable to write "for a long time," and it was "very

21  hard" to use her hands.  AR 225.  She was able take care of her personal needs, but it was "very

22  hard."  AR 228.  She had "pain all over [her] body."  AR 229.

23          Plaintiff completed a handwritten function report on September 10, 2013.  She stated that

24  she generally woke up at 7:30 a.m., got her boys off to school and did light housework.  She took

25  a nap at 11:30, then helped her boys with their homework. She cooked dinner, took a shower and

26  went to bed at 9:00 p.m. AR 231.  She took care of her children by cooking and picking out their

27  clothes.  Her husband helped with the younger children.  Prior to her illness, she was able to

28

                                                2

work, lift heavy things, and hold her children for long periods.  She was also able to type and write, and was active.  Because of her illness, she sometimes could not sleep.

Plaintiff indicated that she had no problem dressing, bathing, grooming her hair, feeding herself, or using the toilet.  AR 232.  She needed reminders to take medication, but not to take care of her personal needs or grooming.  She prepared "very easy dinners" four times a week. Her cooking habits had changed because she now needed to stop, sit or take a rest.  She was able to do some housework by picking up things and vacuuming.  She spent an hour and half performing housework activities.  She sometimes needed help to pick up "big things."  AR 233.

Plaintiff went outside daily.  She was able to go out alone and drive an automobile.  She rarely went shopping.  She was able to pay bills, count change, handle a savings account and use a checkbook or money orders. AR 234.  She had previously done crafts as a hobby, but no longer did so because her hand started hurting after 10 minutes.  She daily spent time with others in person or on the telephone.  She went to her childrens' school on a regular basis.  She had no difficulty getting along with family, friends, neighbors or others.  AR 235-236.

Plaintiff reported that her illness affected her ability to do the following activities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, memory, and using her hands.  She could not lift more than 4 pounds.  She could only walk 30 feet, but also indicated that she could walk one mile before needing to rest.  She could pay attention for one hour.  She was able to finish what she started and could follow written instructions very well, and spoken instructions well.  AR 236.  She got along well with authority figures.  She had never been fired or laid off from a job.  She did not handle stress well, but handled change "ok."  She had not noticed any unusual behavior or fears.  AR 237.

In a follow-up disability report dated December 16, 2013, Plaintiff stated that her limitations had increased since her last report in August, 2013.  Her hands were "not working like they used to."  They "hurt all the time and hurt[] more in use."  AR 238.  She sometimes needed help taking a shower and washing her hair due to pain in her hands and arms.  Her hands hurt more, and it was difficult to do small tasks like lifting, writing or typing.  It was hard to walk up stairs or stand for a long time.  AR 242-243.

3

1    Plaintiff testified at the March 12, 2015 hearing that she left her job as a customer service
2    representative in April 2010 because her hands had started to hurt, and because it was a sit down
3    job and she could not sit for very long.  She did not attempt to find another job—explaining that
4    she goes to a lot of doctor appointments.  She had approximately 10 medical appointments each
5    month.  Her lupus flared up when she became stressed or overexerted herself.  AR 37.  During a
6    flareup, she experienced pain all over, and had sharp pains that felt like a stabbing knife.  She
7    sometimes had difficulty getting out of bed or even trying to drink a cup of water.  She took
8    Hydro Chlopenesian [phonetic spelling], Lyrica, Morphine, Norco, Flexeril, and Miocarbonate
9    [phonetic spelling] for her symptoms.  AR 38.
10    The ALJ noted that the medical records indicated that Plaintiff had increased the use of
11    Prednisone on her own, and had then stopped taking it.  Plaintiff disputed this.  She stated that
12    her doctor gave her Prednisone to take when she had flareups, and to taper-off the medication
13    when the flareups stopped.  AR 38.  Plaintiff testified that she could walk one block before
14    needing to stop and rest.  She could stand at a table for four hours or less.  She could only lift
15    fifteen pounds.  She could sit in one position for approximately forty-five minutes.  AR 39.  She
16    had numbness in both hands if they stayed in one position too long, such as when typing.  It hurt
17    to write or even sign her name.  She sometimes had difficulty using her hands to open doors,
18    fasten buttons, or use zippers.  Her knees gave out if she walked up and down stairs.  AR 40.
19    She could bend over and touch her toes, but it was painful.  Her pain was sometimes so
20    excruciating that it was difficult to focus on the task at hand.  She read, and used a computer for
21    a very short time.  She sometimes went to church.  She got along with others, and had Facebook
22    and Twitter accounts which she rarely used.  AR 41-42.
23    Plaintiff sometimes had difficulty getting dressed, getting in and out of the shower, and
24    tying shoes because of the cramping in her hands.  She drove an automobile, but not often.  She
25    no longer had hobbies.  Her mother helped with the cooking.  Plaintiff needed assistance to go
26    grocery shopping.  Her husband or mother did the laundry and made the beds.  AR 42-43.
27    During a typical day, she would pace back and forth through the house.  She would sit for a short
28    period of time and would then have to stand up or laid down.  She lay down approximately eight

4

hours during the day.  She did not sleep through the night because she could not get comfortable.  Pain would awaken her and she would have to take pain medication.  AR 44.

Plaintiff testified that she had recently undergone injections in her lower back.  However, she identified "C2" through "C7," which indicate the cervical spine.  She had also undergone radio frequency ablation to deaden the nerves in her lower back, and her doctor(s) wanted to perform another such procedure.  AR 44.  In addition to lupus, she had been diagnosed with low thyroid, fibromyalgia, Sjogren's Syndrome, and Raynaud's disease.  AR 45.  She used a TENS unit twice a day.  She used knee braces for both knees, but mostly for the right.  The knee braces were not prescribed, but were, instead, over-the-counter "stretchy" material.  AR 45-46.  Medication dulled her pain for a short time, but never made it completely go away.  Plaintiff's mother lived with her family and assisted in taking care of her children.   AR 46.  Plaintiff testified that she had problems obtaining medications for a period of time due to the loss of or change in insurance coverage.  She stopped taking Methotrexate medication because it caused her to lose her hair and made her very tired.  Her current medications, Morphine, Norco, and Lyrica also caused her to become tired.  AR 47.

Plaintiff had problems dropping small items.  She had swelling in her elbows, knees, wrists, knuckles, and ankles.  She was sensitive to the sun.  AR 48.  Plaintiff's attorney read a list of fibromyalgia symptoms to the Plaintiff and asked her to identify which ones she had.  Plaintiff identified muscle pain and weakness, fatigue, thinking and remembering problems, headaches, abdominal pain or cramps, numbness and tingling, dizziness, insomnia, nausea, nervousness, dry mouth, itching, ringing in the ears, occasional heartburn, loss of taste and appetite, sun sensitivity, and easy bruising.  AR 50-52.

### 2. Vocational Expert's Testimony

The vocational expert described Plaintiff's past work as follows:  She was employed as a financial aid counselor which is classified as sedentary work in the Dictionary of Occupational Titles ("DOT"), but was "a little heavier" work as performed by Plaintiff.  She worked as a debt collector which was light work under the DOT and as performed by Plaintiff.  She also worked

as a collection clerk which was a sedentary work.  Plaintiff's other jobs were of very short

duration and did not qualify as substantial gainful activity ("SGA").  AR 53-54.

The ALJ asked the vocational expert to assume a hypothetical individual with a high

school education and past work as performed by Plaintiff.  The individual would be able to

perform light, unskilled work with the following limitations:  She could occasionally climb,

balance, stoop, kneel, crouch and crawl.  She could frequently reach, handle, finger and feel.

The vocational expert testified that the hypothetical individual would not be able to perform

Plaintiff's past work because the hypothetical eliminated skilled work.  AR 55.  The vocational

expert testified that the hypothetical individual would be able to perform the light, unskilled jobs

of mail clerk, inspector/hand packer, and information clerk.  If the individual was limited to

sedentary work, she could work as a leaf tier (an employee who ties tobacco leaves into bundles),

a telephone quotation clerk, and an addresser (an employee who places addresses on envelopes,

cards, advertising, literature or packages).  AR 55-57, 59.  The hypothetical individual would not

be able to perform any of the listed jobs if she was expected to be absent from work one day a

week.  Nor could she work if she was required to lie down or recline for up to an hour in

unscheduled periods during an eight hour workday.  AR 57.  She would not be able to work if

she was "off task 15 percent of the time."  AR 58.

**3. Medical Records**

Plaintiff was initially seen by Dr. Vijayabhanu Mahadevan on April 29, 2009 with a chief

complaint of lupus.  She reported fatigue, headache, neck pain, loss of hair, pain in the finger

joints, morning stiffness, and pain in the elbows, shoulders, back, hips, knees, and ankles.  She

also reported numbness, hypersomnia and swelling of the hand.  Plaintiff stated that she

experienced the onset of fatigue and join pain following the birth of her second child in February

2007.  She was diagnosed with lupus in October 2008 and was prescribed Plaquenil which had

not helped her symptoms.  Her predominant symptoms were hypersomnia, fatigue and overall

joint pain.  AR 305.  Plaintiff weighed 169 pounds.  The physical examination findings were

generally normal.  Pain was elicited by movement of the shoulder and knee, and the lumbosacral

spine exhibited tenderness on palpation. There was also tenderness on palpation of the ankles.

Trigger points were positive at various locations.  The neurological system appeared normal, except for muscle spasms.  Dr. Mahadevan's assessment was systemic lupus erythematosus without benefit from Plaquenil, and diffuse myalgias suggestive of fibromyalgia.  Plaintiff also had Sjogren's syndrome.[1]  He scheduled Plaintiff for lab tests and prescribed Plaquenil, Diclofenac Sodium, Medrol (Pak), and Tramadol.  AR 305-306.

Dr. Mahadevan next saw Plaintiff on May 20, 2009 with no reported change in her condition.  AR 302.  The Diclofenac medication was discontinued due to lack of benefit, and Gabapentin was prescribed.  AR 303.  On June 17, 2009, Plaintiff reported improvement in her pain. The Gabapentin made her sleepy during the day, however, and "she stopped working because of this and her pain."  AR 299.  Dr. Mahadevan noted that Plaintiff's fibromyalgia was slightly improved on medication and her lupus was stable on Plaquenil.  He increased the dosage of Gabapentin, but stated that if it was not helpful, a prescription for Lyrica would be obtained.  AR 300.

On August 12, 2009, Plaintiff reported that she was still in a lot of pain.  The Gabapentin made her sleepy and was not helpful at the current dosage.  She had recently been hospitalized for chest pain, but the evaluation was negative.  AR 296.  Gabapentin was discontinued and Lyrica was prescribed.  AR 297-298.  On September 23, 2009, Plaintiff reported that the Tradazone was not helpful.  She had been on Lyrica for one month, but it had not yet reduced her pain.  AR 293.  Dr. Mahadevan noted some weight loss and questioned whether there was underlying depression.  AR 293-294.  He assessed Plaintiff's lupus as stable on Plaquenil, except for hair loss that might be related to nutritional deficiency versus stress.  He prescribed physical therapy for Plaintiff's upper and lower extremities and lumbar spine, and continued her on the medications.  AR 294.  Dr. Mahadevan saw Plaintiff on January 14, 2010.  There was no mention of any change in symptoms.  Nor was there any indication that Plaintiff had received physical therapy.  AR 289-291.

---

[1] Sjogren's syndrome is a disorder of the immune system identified by its two most common symptoms—dry eyes and dry mouth.  It is commonly associated with rheumatic diseases such as arthritis or lupus.  *See* https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome /symptoms.  (Accessed by the Court on July 19, 2019.)

On March 11, 2010, Plaintiff reported that she was pregnant and she was there "to discuss stopping her meds." AR 285. Dr. Mahadevan discussed the risks and safety profile of Plaquenil during pregnancy, but Plaintiff stated that she did not want to take it at that time. She was to taper off the Lyrica and Trazadone during the next few days, stop taking Mobic, and use Tylenol until the end of her first trimester. The use of steroids to help with flareups during pregnancy was discussed. AR 286.

On April 6, 2010, Dr. Mahadevan noted that Plaintiff had stopped all her medications and had experienced a major flareup of symptoms which caused her to be seen in the emergency room. AR 281. He had a long discussion with her about the risks of medication during pregnancy, the role of lupus medications, and the flareup of her fibromyalgia after ceasing Lyrica. He noted that Lyrica was not safe during pregnancy. However, Plaintiff could take Plaquenil. Plaintiff indicated that she would discuss the use of medications with her obstetrician ("OB") and call back. Dr. Mahadevan did not see Plaintiff again until October 8, 2010. She was now 33 weeks pregnant, and reported having frequent flareups of lupus and fibromyalgia symptoms. She was referred back to Dr. Mahadevan by her obstetrician to restart some of her medications since she was almost to the end of the third trimester. AR 277. Dr. Mahadevan noted that she was experiencing a flare up of fibromyalgia symptoms. Her lupus appeared clinically stable without synovitis (inflammation), and she still had Sjogren's syndrome. AR 278. He prescribed Plaquenil, Trazodone and Lyrica. AR 279.

Plaintiff apparently gave birth to a healthy child after her visit with Dr. Mahadevan on October 8, 2010 and her next visit with him on December 7, 2010. He noted that Plaintiff was currently breastfeeding and, therefore, did not restart Trazadone. She had restarted low doses of Plaquenil and Lyrica. AR 273. Otherwise the assessment was the same. AR 274. On February 1, 2011, Plaintiff reported that she had been having a lot of pain and had gone to the emergency room a couple of times for right lower quadrant pain. A CT Scan was negative. She had received only modest benefit from the Plaquenil, and was still in a lot of pain despite the increased dose of Lyrica. Vicodin prescribed at the emergency room was of only minimal benefit. Plaintiff had gained weight (she weighed 179 pounds). AR 269-270. Dr. Mahadevan's

assessment was a flareup of fibromyalgia symptoms despite the higher Lyrica dose.  He was not sure if her ongoing pain was due to lupus given the minimum benefit from Prednisone.  AR 270. He continued her on Lyrica, Prednisone, Hydrocodone-Acetaminophen, Plaquenil and Vicodin. AR 271.

On March 1, 2011, Dr. Mahadevan noted that Plaintiff's fibromyalgia symptoms were better with a reduction in pain to 7/10.  Her lupus was also improved.  She weighed 184 pounds. The doctor continued her medication regimen and also started a trial prescription of Savella for treatment of her fibromyalgia. AR 266-267.  On May 3, 2011, Plaintiff weighed 192 pounds.  Dr. Mahadevan noted weight gain due to medications.  Her fibromyalgia pain was at 8/10, which was better than what it was before her current medication regimen.  Her lupus appeared stable, pending lab results.  AR 261-262.  On June 15, 2011, Plaintiff had ongoing pain from fibromyalgia which was, again, better than it was before the current medication regimen.  She was intolerant to Savella.  She had also had a possible flare up of lupus symptoms since she stopped taking Prednisone.  AR 258.  Dr. Mahadevan continued Plaintiff's medication, absent Savella but with Prednisone added.  He also advised Plaintiff to begin regular stretching and a low grade exercise regimen, and encouraged her to lose weight.  AR 259.   There is no record that Plaintiff saw Dr. Mahadevan after June 15, 2011.

Plaintiff saw Dr. Wilson Huang , a perinatologist, on January 10, 2012 pursuant to a referral from her obstetrician, Dr. Nader Abdelsayed.  Dr. Huang noted that Plaintiff "was currently with an intrauterine pregnancy at 13 and 2/7 weeks."  She had previously been treated with Prednisone, but was currently in remission without treatment.  "Today she is comfortable without complaint.  She denies of uterine cramping or vaginal bleeding."  AR 327.  There was no joint pain or swelling.  Plaintiff appeared to be well-nourished, alert, oriented times 3, and in no acute distress.  She weighed 160 pounds.  The remainder of the physical examination was unremarkable. AR 328.  Dr. Huang discussed the potential pregnancy complications associated with lupus, and noted that corticosteroids were the primary therapy for lupus during pregnancy. AR 328-329.

Plaintiff went to the North Vista Hospital emergency room in North Las Vegas, Nevada on January 10, 2012 (apparently after her consultation with Dr. Huang) for complaints of right lower quadrant and right flank pain that began that morning. AR 588. She had been seen at the hospital on December 28-30, 2011 for similar pain, and was seen in consultation by Dr. Eric Grant on December 29, 2011. She described her pain as sharp in intensity at a 9/10 level. AR 595, 597. Plaintiff was also seen at the Valley Hospital Emergency Room on March 23, 2012 for sharp, aching back pain and nausea which had been occurring for five days. AR 404-409. She was again seen in April 2012 for severe back pain. AR 388-401.

Plaintiff saw Dr. Neil Braunstein at Southwest Medical Associates on April 2, 2012 for a follow-up regarding her Sjogren syndrome. He noted that she was off medication and was not currently on Plaquenil. "She has only required rare intermittent prednisone and rare intermittent hydrocodone" which was prescribed by her obstetrician. Dr. Braunstein gave her a new prescription of hydrocodone, noting that she was only taking a few tablets per week. She was having only mild symptoms, "requiring just as needed low dosages of hydrocodone and prednisone." He scheduled her for a follow-up visit after her anticipated delivery date. AR 549.

Plaintiff gave birth to a daughter on July 1, 2012. AR 350. According to an "Operative Record" prepared by Dr. Abdelsayed, the Plaintiff was "scheduled for induction due to chronic pain secondary to lupus. The patient has been on narcotics throughout her pregnancy due to severe episodes of pain, pelvic pain in particular." He noted that "[c]ounseling was done extensively on a number of occasions regarding her narcotic use and the soft balance between need for medication and other management techniques." AR 503.

 On September 18, 2012, Plaintiff underwent a laparoscopic tubal sterilization. AR 533. She saw Dr. Braunstein on December 10, 2012. He noted that she was still nursing her daughter who was now five months old. Plaintiff stated that she could not lower her prednisone and required 20 mg a day. She was ready to go back on hydroxychloroquine (Plaquenil) once she stopped nursing. There was no indication that Plaintiff complained of pain or other symptoms. The brief physical examination note was unremarkable. AR 547. Dr. Braunstein saw Plaintiff on January 1, 2013 at which time she reported having increasing generalized pain. Her

prednisone had been increased by her primary care physician, but did not decrease her pain. This indicated that her pain was non-inflammatory. Dr. Braunstein noted Plaintiff's history of fibromyalgia type pain before her pregnancy, and that it had responded to Lyrica. He prescribed Lyrica and started tapering her off prednisone. AR 545. Dr. Braunstein saw Plaintiff on April 8, 2013 "regarding her history of lupus and fibromyalgia." Plaintiff stated that she had tried to return to work, but was unable to do so because of the flaring up of pain from her underlying condition. Dr. Braunstein's assessment was that Plaintiff had lupus and was doing well on her current therapy. AR 543.

Plaintiff was seen at North Vista Hospital on December 1, 2012 for joint pain of three days duration. AR 583. She was seen there again on December 7, 2012 for right upper quadrant pain of two days duration which was gradually getting worse. AR 574. On February 7, 2013, she was seen for a complaint of sore throat. AR 569. On April 2, 2013, she was seen for a painful injury to her thigh and knee, which she reported injuring while "playing kickball with kids." AR 562. On April 29, 2013, she reported having a lupus flare up with low back pain and migraine headache. She reported a history of migraines, right-sided photophobia and nausea. AR 557. On May 6, 2013, she was seen for an injury to her right foot resulting from a direct blow. AR 551.

Plaintiff saw Dr. Braunstein again on July 29, 2013. He noted that she had been noncompliant with her medications and the instruction to obtain blood work. He stated that "[s]he on her own increased to 15 mg of prednisone and actually discontinued it rapidly 2 week[s] ago and has not taken any since that time and is complaining of a flare-up." He noted, however, that she continued to take Plaquenil and Lyrica. On examination, Plaintiff complained of diffuse tenderness. Dr. Braunstein again referred her for blood work and continued her on medications. He instructed her not to take more than 10 mg of prednisone a day. He scheduled her for routine follow-up in four months. AR 666-667.

Plaintiff saw Dr. David Chu at the Guadalupe Medical Center on December 4, 2013, complaining of left elbow pain which developed several weeks previously, and which she attributed to strenuous use of the arm. Her symptoms were made worse by repetitive

use/activity.  Plaintiff also stated that she needed a referral to rheumatology for her lupus.  AR 670.

Plaintiff was seen by Dr. Ewa Olech at the University of Nevada School of Medicine, Internal Medicine-Rheumatology on January 22, 2014.  Dr. Olech noted that Plaintiff had previously seen Dr. Braunstein, "but can't go there anymore due to insurance reasons."  Plaintiff provided Dr. Olech with a history of her condition and diagnoses of lupus and fibromyalgia.  She had been on Plaquenil since 2007 and on Lyrica since 2009.  She had not noticed much improvement from Plaquenil.  Her chief complaints were myalgia and arthralgias in the upper and lower extremities.  She had a hard time lifting things, difficulty sleeping, and had recent mood changes.  She noticed alopecia (hair loss), but denied rashes or oral ulcers.  Plaintiff experienced right sided chest plains and pleurisy, and had morning stiffness for several hours.  AR 674.  Under review of systems, Dr. Olech listed the following symptoms:  General: fatigue, weakness, malaise, and weight loss; ENT: dryness in nose and mouth; CV: chest pains; Resp: pleurisy; GI: nausea; Derm: hair loss; MS: back pain, joint pain, joint swelling, muscle weakness, stiffness, arthritis, and muscle pain; Neuro: weakness (denied difficulty walking); Psych: memory loss, difficulty falling and staying asleep. (denied depression or anxiety).  AR 675.

Plaintiff weighed 164 pounds and her body mass index ("BMI") was 30.10.  Dr. Olech stated that Plaintiff appeared well developed, well nourished, and in no acute distress.  The physical examination findings were generally normal, except for tenderness along the lumbosacral spine and sacroiliac joints.  There was no obvious joint swelling, but there was tenderness of multiple joints, large and small.  AR 676-677.  Dr. Olech's  assessment was systemic lupus erythematosus which manifested as arthritis, myalgias, alopecia, and fatigue.  Dr. Olech stated that she would order lab studies and x-rays to assess the disease activity.  Plaintiff was instructed to continue with her current medications.  AR 677.  Dr. Olech also assessed "Chronic pain" and "Back pain," and referred Plaintiff for pain management and lab work.  She scheduled Plaintiff for a follow-up appointment in one month.  AR 678-679.

1    Plaintiff received treatment at the Las Vegas Pain Institute and Medical Center ("Pain

2   Clinic") from January 28, 2014 through September 22, 2014.  She was seen approximately 19

3   times during that eight month period.  On January 28, 2014, Plaintiff complained of pain in her

4   entire body.  She described the pain as deep ache and knife like with tingling and numbness

5   sensation.  She rated her current pain level at 7/10, with an average pain level of 8/10.  The pain

6   was increased with movement and pressure, and was decreased by laying down and resting.  The

7   pain interfered with her activities of daily living "most of the time."  Her sleep pattern was poor.

8   She exercised on a regular basis,[2] but had not received physical therapy.  Her pain had

9   progressively gotten worse since 2007.  Her lower back and legs hurt the most. AR 822.

10    On physical examination, Plaintiff had normal bilateral upper and lower extremity

11   strength.  She was unable to demonstrate toe stand or heel and toe walk.  Her gait was steady and

12   unassisted.  She had a positive bilateral seated straight leg raise test.  There was intermittent

13   numbness in her hands.  Her cervical spine was positive for tenderness with paraspinous muscle

14   spasms and bilateral facet loading signs.  There was also decreased range of motion in the

15   cervical spine.  There were no abnormalities in thoracic spine and she had normal curvature of

16   the spine.  There was no tenderness in the upper extremities.  There was positive lumbar spine

17   tenderness with paraspinous muscle spasms and bilateral facet loading signs.  There was also

18   decreased range of motion of the lumbar spine.  Plaintiff was noted to have diffuse muscle

19   tenderness throughout the whole body.  AR 824-825.  The pain management doctor's assessment

20   was lumbago, cervicalgia, thoracic or lumbosacral neuritis or radiculitis, unspecified, and

21   myalgia and myositis, unspecified.

22    Beginning on January 28, 2014, and throughout the course of her treatment at the Pain

23   Clinic, Plaintiff received "IV Push" treatments of Lidocaine/Magnesium/Toradol and

24   Cyanocobalamin.  AR 828-829.  She was also referred for physical therapy.  AR 826.  She was

25   scheduled for a cervical paraspinal trigger point injection, and a right, then left, lumbar medial

26   branch blocks at levels 2-5 (diagnostic blocks).  The doctor would then consider Plaintiff for

27   right, then left, lumbar transforaminal epidural steroid injections at L3-4, L4-5 and L5-S1, after

28   _____

[2] Subsequent office visit notes were inconsistent as to whether Plaintiff exercised regularly.

13

1    reviewing the MRI's.  AR 826-827.  A cervical spine x-ray on January 28, 2014 revealed mild

2    flexion of the cervical spine which was otherwise normal.  An x-ray of the lumbar spine was

3    normal.  AR  830-831.

4              On February 11, 2014, Plaintiff's pain level was somewhat greater than on the prior visit,

5    i.e. 8/10.  AR 832.  However, she allegedly reported 70 percent pain relief with her current

6    medication regimen and 70 percent improvement in function "as applied to either: ADL's

7    occupation, psychological or social, with the current medication regimen."  AR 835.  On

8    February 24, 2014, Plaintiff again reported pain at the 8/10 level.  AR 839.  She was able to

9    demonstrate toe stand and heal walk with good coordination while performing heal toe gait.  AR

10   840.  She was scheduled for lumbar medial branch blocks and physical therapy.  AR 841.  A

11   lumbar spine MRI performed on February 27, 2014, was normal.  AR 844.  A right lumbar facet

12   medical branch block injection was performed on February 28, 2014, followed by a left lumbar

13   facet medical branch block injection on March 3, 2014.  AR 845, 847.  Plaintiff also underwent a

14   cervical paraspinous trigger point injection on March 4, 2014.  AR 849.  On March 5, 2014,

15   Plaintiff reported substantially the same pain complaints as on prior visits.  Her pain level was

16   7/10.  AR 850.  She was advised to continue physical therapy and home exercises and return for

17   a post-procedure follow-up.  AR 852.

18             Plaintiff was seen by Dr. Olech on March 5, 2014 who noted that she was seeing pain

19   management, had received trigger point injections and was still sore.  She had alopecia, fatigue

20   and insomnia, as well as dry mouth.  Under assessment, Dr. Olech noted that Plaintiff was taking

21   Plaquenil, but was still complaining of symptoms, mainly arthritis.  AR 681-684.

22             Plaintiff was treated at the Pain Clinic on March 17-18, 2014, during which she received

23   right and left lumbar facet medical branch block injections under fluoroscopy at L2, L3, L4, and

24   L5.  AR 855-858.  On March 21, 2014, she complained of pain in the knees, elbows and

25   shoulders.  There was no specific complaint of low back pain noted, but lumbar spine tenderness

26   with paraspinous muscle spasms and bilateral facet loading signs were observed on physical

27   examination.  AR 859-860.  Plaintiff reported a 50 percent improvement in function "as applied

28   to either: ADL's occupation, psychological or social, with the current medication regimen."  On

1    March 21, 2014, she underwent bilateral lumbar radio frequency ablations at 2, 3, 4 and 5.[3]  AR

2    861-862.

3         Dr. Olech saw Plaintiff again on April 14, 2014.  Dr. Olech noted that at her last

4    appointment, Plaintiff was started on MTX, but did not get a refill because it caused nausea.  She

5    had recently received injections in the spine by her pain management doctor.  AR 687-693

6         Plaintiff was seen at the Pain Clinic on April 18, 2014, and complained of pain in the

7    lower back, knees, and shoulders.  It was a constant, aching pain with numbness and tingling.

8    Her pain level was 8/10.  AR 864.  MRI's of both knees were scheduled, and Plaintiff was

9    advised to continue physical therapy and home exercises.  Plaintiff advised that she was going

10   out of town for 2 weeks and would be out of medication for one week.  A prescription for MS

11   Contin for one week was prescribed to cover the gap.  AR 866.  Left and right knee MRI's taken

12   on April 18, 2014 showed small knee joint effusion, and were otherwise unremarkable.  AR 869-

13   870.

14        On May 23, 2014, Plaintiff reported pain in the shoulders, legs, knees, and lower back

15   which she rated at 8/10.  AR 871.  On June 19, 2014, Plaintiff reported pain in the entire body

16   with a pain level was 10/10.  She was advised to continue physical therapy and home exercises.

17   AR 877-878.  She received right and left knee injections. AR 880-881.  On June 23, 2014,

18   Plaintiff complained of pain in the entire body at an 8/10 level.  AR 882.  She was scheduled for

19   MRIs of the cervical and thoracic spine, and prescribed more physical therapy.  AR 883, 885-

20   886.  On July 23, 2014, Plaintiff complained of pain in the neck, shoulders, elbows, wrist, and

21   legs with a pain level of 9/10.  AR 887.  The physical therapist's July 30, 2014 treatment note

22   stated that Plaintiff demonstrated "decreased mm strength, decreased functional mobility and

23   gait, and pain with movement.  AR 892.

24        On August 5, 2014, Plaintiff complained of pain in the lower back, both hands, knees and

25   feet at a level of 7/10.  AR 897.  She reported some improvement during physical therapy.  AR

26

27   [3] A lumbar radiofrequency ablation is a procedure that uses radio waves to stop the lumbar medial branch
     nerve from transmitting pain signals from the injured facet joint to the brain.  A needle is inserted through
28   the skin and guided by x-ray to the correct site overlying the medial branch nerve.  *See*
     https://my.cleveland clinic.org (Accessed by the Court on July 24, 2019).

903-908.  On August 12, 2014, however, she had the same pain complaints with a pain level of 8/10.  AR 909.  She received thoracic medial branch block injections on August 12 and 13.  AR 911-915.  On August 15, 2014, she complained of head pain which she rated at 6/10 and she was referred for a CT-Scan of the brain.  AR 924-929.   An MRI of the thoracic spine on August 15, 2014 was normal.  AR 930.  On August 22, 2014, Plaintiff complained of pain in both shoulders, the lower back, both thighs, knees and ankles, with a pain level of 7/10  AR 937. She was advised to continue with physical therapy and home exercises.  A knee brace was also ordered.  AR 939.  Thoracic trigger point injections were administered that day.  AR 941.  On September 22, 2014, Plaintiff complained of pain in the upper back, arms and legs.  She reported a significantly lower pain level of 4/10.  AR 946.

Plaintiff saw Dr. Olech on September 24, 2014, who noted that she was receiving pain management, and had trigger point injections in the back from which she was still sore.  Plaintiff was still experiencing alopecia, fatigue and insomnia.  She also had a dry mouth.  The injections in the spine did not help.  Dr. Olech noted that she had prescribed MTX (methotrexate) which Plaintiff took for only one month.  Plaintiff did not refill the prescription because it caused nausea.  The doctor switched her to leflunomide which she had been on for five months.  Plaintiff tolerated the medication okay, but occasionally had GI upset.  Plaintiff's main concern on September 24, 2014 was severe diffuse alopecia.  Dr. Olech also noted that Plaintiff had been hospitalized in July/August for a lupus flareup, with diffuse arthralgia and myalgias.  She was given IV steroids and pain medications.  Plaintiff reported that she had numbness and tingling in both hands. AR 988.  Dr. Olech continued Plaintiff on prescription medications.  AR 991-993.  There is no indication that Plaintiff continued treatment at the Pain Clinic after her September 24, 2014 appointment with Dr. Olech.

Plaintiff saw Dr. Olech on November 26, 2014.  She complained of diffuse joint pain which was worse in the morning, and was most prominent in her hands and elbow.  Her left foot hurt the most and was swollen.  Her pain was well controlled with Lortab and she was also taking Plaquenil.  She only took prednisone when she had a flareup of symptoms.  Plaintiff also reported dry eyes and mouth, photosensitivity to sunlight, Raynaud's phenomenon, and

1    numbness in the hands and arms.  Plaintiff stated "that her functional capacity ha[d] declined

2    significantly since 2010."  She had intermittent joint stiffness that was so severe that she had to

3    stay in bed until someone helped her get out.  AR 980.  Dr. Olech prescribed additional

4    medication and scheduled Plaintiff for follow-up in two months.  AR 985-986.

5           On February 27, 2015, Dr. Olech wrote a letter addressed to "Whom It May Concern."

6    She stated that Plaintiff "experiences chronic fatigue, polyarthopathy, myalgias, and many other

7    problems that develop before and after flare ups.  At this time, despite trying many different high

8    risk medications to treat the disease, the patient's prognosis remains poor, and her functional

9    capacity has declined significantly.  In my opinion, Ms. Turner will be disabled indefinitely."

10   AR 995.

11          **C. The ALJ's Decision**

12          The ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f) to

13   determine whether Plaintiff was disabled.  The ALJ found that Plaintiff had not engaged in

14   substantial gainful activity since April 1, 2012, which was the amended date for her alleged onset

15   of disability.  At step two, the ALJ found that Plaintiff had the following severe impairments:

16   systemic lupus erythematous, fibromyalgia, and Sjogren's syndrome.  Plaintiff was also obese,

17   but it was not a severe impairment because it did not cause more than minimal limitation in the

18   Plaintiff's ability to perform basic physical work activities. AR 16-17.  At step three, the ALJ

19   found that Plaintiff's impairments did not meet and were not medically equivalent to any

20   condition listed in Appendix 1, Subpart P, of, of 20 C.R.F. §§ 404.1520(d), 404.1525, 404.1526,

21   416.920(d), 416.925, and 416.926. AR 17.

22          Prior to step four of the analysis, the ALJ found that Plaintiff had the residual functional

23   capacity to perform light work, except that she was limited to unskilled work, and she could

24   occasionally climb, balance, stoop, kneel, crouch, and crawl, and was limited to frequent

25   reaching, handling, fingering, and feeling.  AR 17.  The ALJ noted that Plaintiff alleged that she

26   was disabled due to lupus, and was unable to write for a long time, and found it difficult to use

27   her hands for small tasks such as washing her hair, lifting, writing or typing.  She also had

28   difficulty walking upstairs and standing for long periods of time.  Plaintiff had received routine

1   and conservative medical treatment. The medical evidence indicated that she was generally able

2   to control her symptoms with medications, and had experienced flareups when not taking her

3   medications.  She also reported significant pain relief with medications, injections, physical

4   therapy, and other treatment modalities such as medial branch blocks.  AR 18.

5       Although Plaintiff claimed an amended onset date of April 1, 2012, she was pregnant at

6   that time.  The ALJ referenced Dr. Braunstein's April 2, 2012 treatment note that Plaintiff was

7   off her disease medication and only intermittently taking prednisone and hydrocodone.

8   Plaintiff's Sjogren's syndrome was mild and required only low doses of hydrocodone and

9   prednisone.  Plaintiff had few follow-up visits to address her symptoms of lupus, Sjogren's

10  syndrome, and fibromyalgia after the birth of her child in June 2012.  The ALJ noted that she

11  was seen in the emergency room at North Vista Hospital on December 1, 2012 for a flare-up of

12  lupus, and was diagnosed with multiple arthralgias, and treated with prednisone and morphine.

13  Dr. Braunstein's treatment reports in December 2012 indicated that her Sjogren's syndrome was

14  controlled on prednisone.  AR 18.  Dr. Braunstein's January 16, 2013 note stated that Plaintiff

15  reported increased fibromyalgia pain which had responded well to Lyrica prior to her pregnancy,

16  and she was restarted on this medication.  Her prednisone dosage was also reduced.  AR 18.

17      The ALJ cited Dr. Braunstein's April 8, 2012 office note which indicated that "claimant

18  was noted as doing well on her current therapy," and she was continued on her current treatment,

19  with a follow-up visit not scheduled for another four months.  AR 18.  Plaintiff, however, went

20  to the emergency room on April 29, 2013 with a complaint of lupus flareup that was causing

21  migraine headache and low back pain.  The headache resolved prior to discharge, but she still

22  had low back pain.  There was a gap in treatment after April 2013 until July 29, 2013 when Dr.

23  Braunstein stated that Plaintiff had not been taking her medication as prescribed, and had not

24  followed-up with blood work as instructed.  AR 19.

25      The ALJ stated that there was little further medical evidence of record after July 29, 2013

26  until Plaintiff was evaluated by Dr. Olech in January 2014 and began treatment at the Las Vegas

27  Pain Institute and Medical Center.  The ALJ noted that Plaintiff reported 70 percent relief in her

28  pain on February 11, 2014 and had improved physical abilities on February 24, 2014.  AR 19-20.

18

On March 21, 2014, she had grossly normal motor function and sensory function, as well as full range of motion in all extremities. Despite previous referrals, Plaintiff did not begin physical therapy until July 30, 2014, and she reported decreased pain and stiffness following therapy on August 5, 2014. There was little evidence that Plaintiff continued physical therapy after August 2014. AR 20. Plaintiff reported to Dr. Olech on September 24, 2014 that her main concern was severe hair loss. She also complained of back pain, joint pain, muscle weakness, and pain, numbness and tingling in her hands. Although Plaintiff reported that she was hospitalized in July or August 2014 for a lupus flare up, there was no medical evidence regarding this hospitalization.[4] In follow-up with Dr. Olech on November 26, 2014, Plaintiff reported that her pain was well controlled with Lortab and that she only took prednisone when she had a flare up. However, she also reported severe joint stiffness.

The ALJ also noted that in April 2014, Plaintiff told her pain management physician that she was planning to go out of town for two weeks. He stated that although travel and disability are not necessarily mutually exclusive, Plaintiff's intention to travel tended to suggested that her alleged symptoms and limitations may have been overstated. He also found that Plaintiff did not receive the type of medical treatment one would expect for a totally disabled individual, and that she was generally able to control her symptoms with medication. AR 21.

The ALJ found that Plaintiff made inconsistent statements regarding her activities and abilities. He pointed to her September 10, 2013 function report in which she stated that she could only walk 30 feet, but could walk one mile before needing to rest. AR 22. Despite her alleged inability to use her hands, she complained in December 2012 of left elbow pain that was caused by strenuous use of her arm. She told the Pain Clinic in January 2014 that pain medication provided relief, but also stated that her pain was getting progressively worse and narcotics did not help. The ALJ stated that "inconsistent information . . . may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest the information

---

[4] After the ALJ's decision, Plaintiff's counsel obtained medical records from North Vista Hospital showing that Plaintiff was seen on July 19, 2014 for complaints of pain "all over" due to lupus. AR 1051-1052. She was seen again on August 18, 2014 for edema. AR 1054. The records do not provide a detailed narrative of Plaintiff's symptoms or treatment or condition at discharge.

1   provided by the claimant may not be entirely reliable." He also noted that the claimant failed to

2   follow treatment recommendations at times. AR 22.

3       The ALJ gave "reduced weight" to Dr. Olech's opinion that Plaintiff's functional

4   capacity had declined significantly and that she was disabled. The determination of disability is

5   reserved for the Commissioner, who is not bound by a treating physician's conclusory opinion

6   that a claimant is disabled. Dr. Olech had only treated Plaintiff sporadically, and there was a

7   significant gap in her treatment of Plaintiff between April and September 2014. The ALJ also

8   found that Dr. Olech's opinion was inconsistent with the record as a whole, as well as with the

9   Plaintiff's description of her activities of daily living, including that she is able to take care of

10  four children, cook, shop, and do most of the activities to keep up her household. Finally, Dr.

11  Olech's opinion was vague and conclusory, and did not provide specific work limitations. AR

12  22. The ALJ gave significant weight to the opinions of the state agency medical consultants, Dr.

13  Goodrich and Dr. Braverman, who reviewed the medical records. Dr. Goodrich opined on July

14  9, 2013 that Plaintiff had the residual functional capacity to perform light work. AR 65-67. Dr.

15  David Braverman also found on November 9, 2013, that Plaintiff could perform light work. AR

16  88-90.

17      Based on his determination of Plaintiff's residual functional capacity and the vocational

18  expert's testimony, the ALJ found at step four that Plaintiff was not able to perform her past

19  work. AR 23. He found at step five, however, that she was able to perform the jobs of mail

20  clerk, inspector and hand packer, information clerk, leaf tier, telephone quotation clerk, and

21  addresser. AR 24-25. The ALJ, therefore, concluded that Plaintiff was not disabled at any time

22  between the alleged onset of disability on April 1, 2012 and the date of his decision.

23                            **DISCUSSION**

24      **I. Standard of Review**

25      A federal court's review of an ALJ's decision is limited to determining (1) whether the

26  ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the

27  proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v.*

28  *Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence

1    as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

2    reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL

3    1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see*

4    *also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole

5    and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.

6    1993). Where the factual findings of the Commissioner of Social Security are supported by

7    substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g).

8    Hence, where the evidence may be open to more than one rational interpretation, the Court is

9    required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting

10   *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)); *see also Vasquez v. Astrue*, 572 F.3d

11   586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the

12   evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of*

13   *Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

14        It is incumbent on the ALJ to make specific findings so that the court need not speculate

15   as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v.*

16   *Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine

17   whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings

18   "should be as comprehensive and analytical as feasible and, where appropriate, should include a

19   statement of subordinate factual foundations on which the ultimate factual conclusions are

20   based." *Lewin*, 654 F.2d at 635.

21        In reviewing the administrative decision, the court has the power to enter "a judgment

22   affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or

23   without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the court

24   "may at any time order additional evidence to be taken before the Commissioner of Social

25   Security, but only upon a showing that there is new evidence which is material and that there is

26   good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

27   . . .

28   . . .

## II. Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007).  Social Security disability claims are evaluated under a five-step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a).  The ALJ correctly set forth five steps in his decision, AR 15–16, and they will not be repeated here.

## III. Whether the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Olech's disability opinion.

As a general rule, more weight should be given to the opinion of a treating physician than to the opinions of examining or reviewing physicians. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The weight afforded to a non-examining physician's opinion depends on the degree to which he provides supporting explanation for his opinions.  *Id.*  20 C.F.R. § 404.1527(c)(2) states that a treating physician is likely to be "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations such as consultive examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  If the

1    treating physician's opinion on the nature and severity of the claimant's impairment is well-

2    supported by medically acceptable clinical and laboratory diagnostic techniques and is not

3    inconsistent with other substantial evidence in the case record, it will be given controlling

4    weight.  *Id.*

5          Even if the treating physician's opinion is not given controlling weight, the ALJ is

6    required to consider certain factors in determining the weight to be given to the opinion.  20

7    C.F.R. § 404.1527(c)(2).  These factors include (i) the length of the treatment relationship and

8    the frequency of examination, and (ii) the nature and extent of the treatment relationship.  *Id.*  In

9    evaluating the opinions of treating, examining and nonexamining physicians, the ALJ should

10   consider the extent to which the opinion is supported by relevant evidence, particularly medical

11   signs and findings; the extent to which the opinion is consistent with the record as a whole;

12   whether the physician is a specialist opining within the area of his specialty; and other factors,

13   including the physician's familiarity with Social Security disability programs and their

14   evidentiary requirements.  20 C.F.R. § 404.1527(c)(3)–(6).

15         The ALJ must provide specific and legitimate reasons supported by substantial evidence

16   to reject the opinion of a treating physician.  *Garrison v. Colvin*, 759 F.3d at 1012.  "This is so

17   because, even when contradicted, a treating or examining physician's opinion is still owed

18   deference and will often be 'entitled to the greatest weight ... even if it does not meet the test for

19   controlling weight.'"  *Id.* (quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).  The ALJ

20   is not bound by a treating physician's ultimate opinion that a patient is disabled.  *McLeod v.*

21   *Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).  However, a treating physician's opinion on disability,

22   even if controverted, can be rejected only with specific and legitimate reasons supported by

23   substantial evidence in the record.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

24         The ALJ stated that Dr. Olech's treatment of Plaintiff was sporadic, with only four visits

25   after January 2014, and there was a significant gap in treatment between April and September

26   2014.  AR 22.  Plaintiff argues that the ALJ indirectly asserted that Dr. Olech did not qualify as a

27   treating physician.  *Motion for Reversal* (ECF NO. 17), at 6-7.  That, however, is a misreading of

28   the ALJ's decision.  The ALJ referred to Dr. Olech as "the claimant's treating physician," and he

1    made no assertion that she did not qualify as a treating physician.  The ALJ did not err in

2    discounting the weight of Dr. Olech's opinion based the lack of frequency in treatment and the

3    significant gap in treatment.

4         Plaintiff also argues that the ALJ improperly discounted Dr. Olech's opinion on the

5    grounds that Plaintiff's activities of daily living were inconsistent with significant pain and

6    fatigue.  This ground is dependent on the credibility of Plaintiff's statements and testimony

7    regarding the severity of her symptoms which is addressed in the next section.  If Plaintiff's level

8    of activities did not correspond with her alleged symptoms, then it was reasonable to discount the

9    weight of Dr. Olech's opinion on that basis.  Conversely, if Plaintiff's statements and testimony

10   were improperly discredited, then discounting Dr. Olech's opinion on that basis would also be

11   invalid.

12        Plaintiff argues that the ALJ improperly discounted Dr. Olech's opinion as vague and

13   conclusory.  The ALJ stated that Dr. Olech did not "provide specific work-related limitations for

14   the claimant or objective findings upon which the opinion is based.  AR 22.  She did not state

15   how much weight Plaintiff could lift and carry, how long she could sit, stand or walk during an

16   eight-hour workday, or to what extent she could use her hands and fingers to perform work

17   related activities.  The ALJ did not err in discounting the weight of Dr. Olech's opinion based on

18   the lack of specific work-related limitations.

19        Plaintiff argues that the ALJ erred in giving greater weight to the opinions of the state

20   agency reviewing physicians than to Dr. Olech.  The ALJ found that the opinions of the state

21   agency physicians were consistent with the record as a whole, including Plaintiff's activities of

22   daily living.  Additionally, Dr. Goodrich had an understanding of social security programs and

23   requirements.  AR 23.  Plaintiff points out that Dr. Olech is a rheumatologist and that Plaintiff's

24   lupus is within the scope of her medical specialty and, therefore, entitled to greater weight.

25   While this is a legitimate point, the weight to be accorded to a treating specialist's opinion can

26   also be overcome by the other factors, such as whether it is supported by clinical findings, and is

27   consistent with the other evidence in the record as a whole.

28

1    Plaintiff's strongest argument is that the state agency physicians rendered their opinions

2    in 2013, and did not have the opportunity to review the Pain Clinic treatment records or Dr.

3    Olech's treatment notes in 2014.[5]  Dr. Goodrich's and Dr. Braverman's opinions were based, in

4    significant part, on the medical records of Dr. Braunstein who treated Plaintiff in 2012 and 2013.

5    The ALJ also relied on Dr. Braunstein's treatment notes which indicated that Plaintiff's

6    symptoms were either not severe, or were well controlled by medication.  AR 18-19.

7    The ALJ noted that on February 11, 2014, two weeks after Plaintiff began pain

8    management treatment, she reported 70 percent pain relief with her current medical regimen.

9    She also had increased mobility on February 24, 2014; and in May 2014 she reported significant

10    pain reduction and that her back was feeling much better.  In August 2014, Plaintiff reported

11    more than 70 percent relief with thoracic medial branch blocks.  AR 19-20.  The weight that

12    should be accorded to these entries, if any, is debatable.

13    Throughout her treatment at the Pain Clinic, Plaintiff consistently reported pain levels at

14    7/10 or 8/10 on a scale of 1 to 10.  On February 11, 2014, the same day she allegedly reported 70

15    percent pain relief with her current medical regimen, Plaintiff reported constant and sharp pain in

16    the lower back and knees, with a pain level of 8/10.  AR 832.  She thereafter received medial

17    branch block injections in the lumbar spine, and had a cervical spine trigger point injection.

18    Despite these procedures, Plaintiff reported on March 5, 2014 that she had pain in the shoulders,

19    elbows, hips, lower back, hands, knees and feet.  Her current pain level was 7/10, with the

20    average being 8/10.  She received bilateral lumbar radiofrequency ablations on March 21, 2014.

21    Yet, on April 18, 2014, she again complained of pain in the lower back, knees, and shoulders that

22    was constant, and aching with numbness.  She rated her pain as 8/10.  AR 864.

23    On August 12 and 13, 2014, Plaintiff received right and left thoracic facet medial branch

24    block injections.  AR 913, 915.  Although she reported more than 70 percent relief on August

25    15th, there is no indication that this was more than a temporary result.  Her pain level was back

26

27    [5] There is no evidence that Dr. Olech reviewed the Pain Clinic treatment records.  Her notes indicate that
she relied on Plaintiff's descriptions of the treatment she received.

28

1  to 7/10 on August 22, 2014.  She underwent a thoracic trigger point injection on August 22,

2  2014, AR 941, and had a significantly lower pain level of 4/10 on September 22, 2014.  AR 946.

3  There are no Pain Clinic records after that date to indicate whether this decreased pain level

4  continued or whether Plaintiff returned to higher pain levels.  The Pain Clinic records are silent

5  as whether the physicians considered Plaintiff's reported high pain levels to be credible.

6          The bottom line is that Dr. Olech's February 27, 2015 disability opinion was not

7  adequately supported by a specific discussion of Plaintiff's functional limitations or by evidence

8  that the doctor had reviewed and considered all of the relevant medical evidence.  Dr. Olech's

9  opinion, however, was not directly contradicted by the state agency physicians' 2013 opinions

10  because they did not review Plaintiff's symptoms and medical treatment during 2014.  Reliable

11  medical opinion regarding the severity of Plaintiff's symptoms in 2014 and their effect on her

12  functional capacity is, therefore, lacking.

13          **IV.  Whether the ALJ erred is rejecting the credibility of Plaintiff's statements and**

14  **testimony regarding the severity of her symptoms.**

15          In evaluating the credibility of a claimant's testimony regarding the severity of pain and

16  other symptoms, the ALJ must first determine whether the claimant has presented objective

17  medical evidence of an underlying impairment which could reasonably be expected to produce

18  the pain or other symptoms alleged.  *Garrison v. Colvin*, 759 F.3d at 1014, *Lingenfelter v.*

19  *Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  If the claimant satisfies the first step, and there

20  is no evidence of malingering, then the ALJ can only reject her testimony by offering specific,

21  clear, and convincing reasons for doing so.  *Id.* at 1014–15 (citing *Smolen v. Chater*, 80 F.3d

22  1273, 1281 (9th Cir. 1996) and *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)).

23          An ALJ may not discredit a claimant's testimony solely on the grounds that the objective

24  medical evidence does not support her testimony.  To find the claimant not credible, the ALJ

25  must rely either on reasons unrelated to the subjective testimony, e.g., reputation for dishonesty,

26  on conflicts between her testimony and her own conduct, or on internal contradictions in that

27  testimony.  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006).  Social Security

28

Ruling (SSR) 16-3p,[6] 2017 WL 5180304, at *5, states that "objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities[.]"  The ALJ must consider whether an individual's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the medical signs and laboratory findings.   The ALJ may not disregard a claimant's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged.  *Id.*

In finding that Plaintiff's statements and testimony regarding the severity of her symptoms were not "entirely credible," the ALJ stated that Plaintiff's descriptions of her daily activities were not as limited as one would expect.  He described the activities that Plaintiff was able to engage in, but did include the limitations that Plaintiff placed on those activities, or how her ability to perform them changed over time.  AR 21.

In *Garrison v. Colvin*, 759 F.3d at 1016, the court stated that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day. Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.  Only if the level of activity is inconsistent with the claimed limitations, will thee activities have any bearing on credibility. The court also noted the critical differences between activities of daily living and activities in a full-time job.  The court stated that the ALJ committed two errors:  First, the ALJ mischaracterized the claimant's testimony by ignoring the limitations that she placed on her ability to perform certain activities.  Second, the ALJ erred in finding that the claimant's activities, if performed in the manner she described, were inconsistent with her testimony regarding her pain related impairments.

In this case, the ALJ summarized the activities that Plaintiff stated that she was able to perform, but not the limitations she placed on those activities.  The ALJ also failed to consider

---

[6] Plaintiff argues that SSR 16-3p applies to this case.  *Motion* (ECF No. 17), at 13, n. 4.

1   Plaintiff's statements that she became increasingly more limited after her initial disability and

2   function reports.  For example, Plaintiff stated in August 2013 that while she could take care of

3   her personal needs, it was "very hard."  AR 228.  In her December 2013 disability report,

4   Plaintiff stated that her limitations had increased since her previous report, and that she now

5   sometimes needed help taking a shower and washing her hair.  AR 238.  She testified at the

6   hearing that her mother helped with cooking, and that she needed assistance grocery shopping.

7   Her husband and mother did the laundry and made the beds.  AR 42-43.  She stated that she laid

8   down approximately eight hours during the day.  Plaintiff also testified that she only read and

9   used a computer for a short time.  She drove an automobile, but not often.  AR 41-43.  Plaintiff

10  repeatedly emphasized the difficulty that she had in typing or writing, and the problems that she

11  had with insomnia and fatigue.

12          The two incidents referenced by the ALJ to discount Plaintiff's testimony were too

13  sketchy to support a finding that she was not as limited as she claimed.  Plaintiff sought medical

14  treatment for her knee and thigh which she injured while "playing kickball with kids."  AR 562.

15  The information that Plaintiff suffered an injury while engaging in a physical activity is hardly

16  consistent with the ability to participate in sports or engage in physical play on a regular basis.

17  The ALJ did not explore this incident during the hearing to inquire into the extent, if any, that

18  Plaintiff regularly participated in sports or play activity.  The ALJ recognized that travel is not

19  necessarily inconsistent with disability.  He nevertheless discounted Plaintiff's credibility based

20  on her travel, without asking where she went, how she got there, and what activities she engaged

21  in.

22          The ALJ stated that Plaintiff did not generally receive the type of medical treatment one

23  would expect for a totally disabled individual.  AR 21.  This statement might have been valid in

24  regard to Plaintiff's medical treatment prior to January 2014.  It was not a valid characterization

25  of her treatment in 2014.  During the first nine months of that year, Plaintiff received numerous

26  IV pushes of pain medication.  She received injections into her cervical, thoracic, and lumbar

27  spine and knee joints.  She also received bilateral lumbar radiofrequency ablations.  She was also

28  prescribed numerous medications to treat her symptoms, some of which Dr. Olech described as

1    "high risk." This level of medical treatment is beyond what is generally characterized as

2    "conservative." It is consistent with the treatment of a patient experiencing severe symptoms

3    from lupus, fibromyalgia or chronic pain.

4        The few inconsistencies that the ALJ noted in Plaintiff's function reports and medical

5    records, AR 22, were not sufficient to discredit the accuracy or truthfulness of her statements and

6    testimony. There was an obvious disparity in the function report in which Plaintiff first stated

7    she could not walk more than 30 feet, but then stated she could walk up to a mile before needing

8    to stop and rest. In her other statements and testimony, however, Plaintiff consistently stated that

9    he ability to stand, walk or sit was limited by pain and fatigue. Plaintiff's statements that she

10    received some relief from medication was inconsistent with her reported statement during the

11    same visit that narcotics did not help with pain. Pointing out a few isolated inconsistencies,

12    however, is not enough to discredit a claimant's testimony. Overall, Plaintiff indicated that she

13    received some relief from medication, but that her symptoms were getting worse, and that she

14    continued to experience high levels of pain.

15        The Court finds that the ALJ did not provide specific, clear, and convincing reasons for

16    rejecting the credibility of Plaintiff's testimony regarding the severity of her pain and limitations,

17    particularly in 2014.

18    **IV. Whether this case should be remanded for an award of benefits or for further**

19    **administrative proceedings.**

20        The Ninth Circuit has established a three-part credit-as-true standard which must be

21    satisfied in order to remand a case to the Social Security Administration with instructions to

22    calculate and award benefits. The test requires the court to find that (1) the record has been fully

23    developed and further administrative proceedings would serve no useful purpose; (2) the ALJ

24    failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or

25    medical opinion; and (3) if the improperly discredited evidence was credited as true, the ALJ

26    would be required to find the claimant disabled on remand. *Garrison v. Colvin*, 759 F.3d at 1020

27    (citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008); *Lingenfelter

28    v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007);

*Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).  *Garrison* states that it may be an abuse of discretion not to remand with direction to make payment when all three conditions are met.  The court stated, however, that the rule envisions some flexibility and the case should be remanded for further proceedings if an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.  *Id.* at 1020–21.  In *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101–02 (9th Cir. 2014), the court stated that even when the elements of the credit-as-true rule are present, the decision to remand for additional evidence or simply to award benefits is in the discretion of the court.

## CONCLUSION

The record in this case could support the ALJ's opinion that Plaintiff's symptom and limitations were not so severe as to be disabling up through the end of July, 2013, and possibly thereafter.  Such a conclusion is supported by Dr. Braunstein's treatment notes and the opinions of the state agency physicians.  The ALJ, however, failed to consider Plaintiff's testimony that her symptoms were progressively getting worse, and he improperly discounted the credibility of her testimony.  He also failed to accurately consider the 2014 Pain Clinic records by focusing on those entries which indicated improvement in Plaintiff's symptoms, but failing to consider the records, as a whole, which indicated that Plaintiff continued to experience high levels of pain.  Although Dr. Olech's February 27, 2015 opinion was deficient, it was the only medical opinion on the issue of whether Plaintiff was disabled by her symptoms in 2014 and 2015.  This case should, therefore, be remanded to determine whether Plaintiff's symptoms became disabling in 2013 or 2014.  This does not preclude a finding on remand that Plaintiff was disabled as far back as her alleged onset date in April 2012, if the evidence supports such a conclusion.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal or Remand (ECF No. 17) be **granted**, and that the Commissioner's Cross-Motion to Affirm and Opposition to Plaintiff's Motion to Remand (ECF No. 20) be **denied.**

1    **IT IS FUTHER RECOMMENDED** that this matter be remanded to the agency to

2    determine whether and when Plaintiff became disabled as a result of her symptoms and

3    limitations.

4                                   <u>**NOTICE**</u>

5    Pursuant to Local Rule IB 3–2, any objection to this Finding and Recommendation must be in

6    writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has

7    held that the courts of appeal may determine that an appeal has been waived due to the failure to

8    file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit

9    has also held that (1) failure to file objections within the specified time and (2) failure to properly

10   address and brief the objectionable issues waives the right to appeal the District Court's order

11   and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153,

12   1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

13          Dated this 29th of July 2019.

14

15   _____

16   **GEORGE FOLEY, JR.**
     **UNITED STATES MAGISTRATE JUDGE**

17

18

19

20

21

22

23

24

25

26

27

28